# Illinois Official Reports

## Appellate Court

---

*Jill Knowles Enterprises, Inc. v. Dunkin*, **2017 IL App (2d) 160811**

---

| | |
|---|---|
| Appellate Court Caption | JILL KNOWLES ENTERPRISES, INC., Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. MARY ANN DUNKIN, Defendant and Counterplaintiff-Appellant and Cross-Appellee. |
| District & No. | Second District<br>Docket No. 2-16-0811 |
| Filed | June 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 15-SC-5759; the Hon. Theodore S. Potkonjak, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; attorney-fee award vacated. |
| Counsel on Appeal | David C. Dunkin, Hal R. Morris, and Michael J. Pollock, of Arnstein & Lehr LLP, of Chicago, for appellant.<br><br>B. Lane Hasler, of B. Lane Hasler, P.C., of Chicago, for appellee. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant and counterplaintiff, Mary Ann Dunkin, appeals an order of the circuit court of Lake County granting judgment in favor of plaintiff and counterdefendant, Jill Knowles Enterprises, Inc. (JKE), in the amount of $8955.98 following a bench trial. JKE cross-appeals an order awarding it $9392.85 in attorney fees, contending that it was entitled to over $23,000. For the reasons that follow, on Mary Ann's appeal, we affirm the judgment in part, reverse it in part, and enter judgment in Mary Ann's favor and against JKE in the amount of $3424.66. On JKE's cross-appeal, we vacate the judgment.

¶ 2                                      I. BACKGROUND

¶ 3      This small-claims litigation stemmed from a heated dispute over fees for boarding Mary Ann's horse, Zidane. JKE, doing business as Hidden Knoll in Wadsworth, Illinois, is a facility that trains and boards horses. The proprietor is Jill Knowles. On September 7, 2013, the parties entered into a written contract for Zidane's boarding. The contract provided that it was "month to month" for "eight hundred dollars ($950) [*sic*] per month." The contract also provided for finance charges and late fees. In addition, the contract contained an attorney-fee-shifting provision. In approximately June 2014, JKE raised the monthly boarding rate to $1000. Mary Ann did not protest that amount, and her husband, David, paid some of the bills at that rate. However, beginning in approximately August 2014, Mary Ann became delinquent in payments.

¶ 4      In approximately February 2015, David desired to sell Zidane. Knowles took Zidane to Florida, because potential buyers were there for the winter horse-show circuit. Knowles testified that she informed David that the fees for the Florida venture would be $10,000 to $12,000 per month. David verbally agreed. Zidane was with Knowles in Florida for approximately five weeks. Meanwhile, the monthly boarding fees at Hidden Knoll continued to accrue because JKE kept Zidane's stall reserved for his return from Florida.

¶ 5      In February 2015, Knowles made repeated demands for payment of the Hidden Knoll boarding bill, and she threatened legal action. On February 26, 2015, David directed his bank to wire $10,000 to JKE, and JKE applied that payment to the delinquent Hidden Knoll boarding fees, leaving a balance due of approximately $7000.

¶ 6      On March 17, 2015, JKE invoiced Mary Ann for the Florida venture in the amount of $10,181.25. The invoice contained a notice that it would be considered overdue on the "fifth" of the month.

¶ 7      On March 20, 2015, JKE's accountant's office notified David that the outstanding Hidden Knoll balance was $6575.34. On that date, the accountant's office also informed David of the amount of the Florida bill. On March 21, 2015, David directed his bank to wire another $10,000 to JKE. Knowles directed her accountant to apply it to the Florida bill rather than to the Hidden Knoll balance. Then, on November 16, 2015, JKE filed suit against Mary Ann for breach of contract, or, in the alternative, for account stated to recover the balance of $7358.73 that it claimed was still owed for the Hidden Knoll boarding fees. JKE also sought reimbursement for its attorney fees. Attached to JKE's complaint as exhibits were the written contract and certain paid and unpaid invoices. Also attached as an exhibit was a document showing an outstanding balance of $7358.73 as of October 31, 2015. The lawsuit sought to

recover only for the money due on the Hidden Knoll account. The lawsuit also requested attorney fees for collecting the amount due.

¶ 8 Mary Ann obtained leave of court to file an answer, a counterclaim, and affirmative defenses. Mary Ann denied that the monthly boarding fee was either $950 or $1000 but claimed that it was $800. In her first affirmative defense, Mary Ann alleged that, as of March 15, 2015, she owed JKE $6575.34 for the Hidden Knoll boarding fees and that the $10,000 that was wired on March 21, 2015, was to be applied toward that balance. She also alleged that she made an overpayment of $3424.66. In her second affirmative defense and counterclaim, Mary Ann alleged that the base contract amount was $800 per month and that the increase to $1000 was never effective because she never signed a document agreeing to the increase, as required by the contract. Mary Ann sought a setoff of $3650 from any judgment against her.[1]

¶ 9 The bench trial commenced on May 24, 2016. JKE's attorney questioned Knowles about the documents that were attached to the complaint as exhibits and about additional unpaid invoices after October 31, 2015, showing that the balance Mary Ann owed to JKE as of May 18, 2016, was $7923.79. JKE's attorney did not mark any documents as trial exhibits or move to admit them into evidence. On November 22, 2016, approximately two months after the notice of appeal was filed, the court, apparently *sua sponte*, entered an order purporting to admit "all exhibits into evidence for purpose of appeal."

¶ 10 At trial, Knowles testified that the base contract amount for boarding Zidane was $950 per month and that the $800 figure printed on the contract was a scrivener's error. Knowles testified that neither Mary Ann nor David objected to the invoices reflecting either the $950 amount or the increase to $1000. According to Knowles, $7358.73 was due under the written contract as of October 31, 2015. Additional unpaid invoices raised the amount due as of May 18, 2016, to $7923.79. Also, she testified that finance charges continued to accrue.

¶ 11 In response to her attorney's question—"Did defendant's husband, David Dunkin, ask for a bill for the services in Florida so it could be paid after the horse was sold?"—Knowles answered "Yes." She testified that on March 24, 2015, her accountant's office gave David an invoice showing the entire outstanding balance for the boarding at Hidden Knoll as well as an invoice for the Florida venture. The accountant's office also informed David that the second wire transfer had been applied to the Florida invoice. According to Knowles, Zidane was sold on March 26, 2015.

¶ 12 Mary Ann testified that David handled the financial issues with JKE.

¶ 13 David testified that he never received or reviewed the contract for boarding Zidane at Hidden Knoll and did not question the rates when he received the invoices. David testified that he was concerned with paying the Hidden Knoll bill in full because he wanted to sell Zidane and he knew that JKE could assert a lien that might interfere with a sale of the horse. David testified that Knowles never directly threatened to impose a lien but that she threatened to get her attorney involved. According to David, he sent the second wire transfer in the amount of $10,000, instead of the exact amount of the Hidden Knoll bill, to provide a "cushion" for unforeseen add-ons, such as a charge for a farrier. He also testified that, if he had intended to pay the Florida bill, he would have wired the exact amount of that invoice. David testified that he told Knowles that they would resolve the Florida bill "after [Zidane] was sold and the

---

[1]The issues addressed in the second affirmative defense and counterclaim are not argued in this appeal. Accordingly, we affirm the judgment in favor of JKE on the counterclaim.

money [was] wired and the deal closed." David further testified that he and Knowles had an "understanding" that the Florida bill would be paid after the horse was sold. David testified that he had not authorized the amount Knowles charged for the Florida venture and that he was "shocked" when he received the bill. According to David, he did not include instructions with the wire transfers to apply the payments to the Hidden Knoll bill because such instructions could not be included on the wire transfer forms.

¶ 14 The record shows that Knowles sent David a text message on February 25, 2015, threatening to have her attorney begin the "lien process" unless the Hidden Knoll bill was paid. The following day, David requested his bank to wire JKE $10,000. Knowles sent David a text message acknowledging receipt of the money and again pleaded with him to pay the rest of the bill. On March 21, 2015, David caused another $10,000 to be wired to JKE.

¶ 15 JKE argued to the court that the law permitted JKE to decide where to apply the payment in the second wire transfer. Mary Ann argued that JKE had to apply the payment to the Hidden Knoll bill, because David had directed Knowles to do so. The court ruled in JKE's favor: "I think it's within the province of the plaintiff where they [*sic*] should apply it to whichever of their [*sic*] open accounts." The court continued the matter for arguments on the amount of damages and JKE's attorney fees.

¶ 16 On August 29, 2016, JKE's attorney, B. Lane Hasler, asked for $8022.88 in damages. That figure included finance charges. Hasler asked for the same amount in attorney fees. In response to the court's question of how much Hasler was asking for fees, Hasler responded: "It's exactly the same as whatever you award for damages." Then Hasler explained that he was "capping" his fees, although JKE owed $23,165.

¶ 17 On September 7, 2016, the court awarded JKE damages in the amount of $8022.88 and costs in the amount of $933.10. The $8022.88 figure represented the unpaid balance of the Hidden Knoll bill plus finance charges. Hasler again requested attorney fees in the same amount as the damages. He stated that he recognized that the court had a policy of not awarding fees in excess of a judgment "and we're willing to accept the court's ruling." Then Hasler declared that he would seek the full amount of his fees if Mary Ann appealed. Mary Ann's attorney argued that Hasler's rate of $395 per hour was excessive. The court awarded Hasler $9392.85 based on a formula that equaled $131 per hour.

¶ 18 Mary Ann filed a timely appeal, and JKE filed a timely cross-appeal.

¶ 19                                    II. ANALYSIS
¶ 20                                 A. Mary Ann's Appeal
¶ 21 Before turning to the merits, we must address Mary Ann's contention that JKE's failure to admit its exhibits into evidence necessitates a reversal because there is no competent evidence in the record to support the judgment. It is generally true that a document must be offered by its proponent and admitted into evidence by the trial court before it may be considered as evidence. *People v. One 1999 Lexus*, 367 Ill. App. 3d 687, 689-90 (2006). It is error to permit the trier of fact to consider documents that have not been tendered or admitted into evidence. *One 1999 Lexus*, 367 Ill. App. 3d at 689-90.

¶ 22 JKE asserts that Mary Ann forfeited this argument because she did not raise it before the trial court. However, forfeiture is a limitation on the parties and not on the appellate court. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 377-78 (2008). We can overlook forfeiture and

address the merits of an issue when it is necessary to obtain a just result or to maintain a sound and uniform body of precedent. *Holthaus*, 387 Ill. App. 3d at 378. We choose to overlook forfeiture because it is necessary to the development of a sound body of precedent concerning what documents can be included in an appellate record pursuant to Illinois Supreme Court Rule 321 (eff. Feb. 1, 1994). This discussion is necessitated by the trial court's November 22, 2016, order.

¶ 23 The November 22, 2016, order purporting to "admit" "all exhibits into evidence for purpose of appeal" was ineffective. Even if we knew from reading the order to what specific exhibits it referred, the order could not retroactively admit the exhibits. A *nunc pro tunc* order must be based on some memorandum or memorial in the record indicating that the omission sought to be corrected was an inadvertent clerical error. *Z.R.L. Corp. v. Great Central Insurance Co.*, 201 Ill. App. 3d 843, 845 (1990). JKE's failure to introduce its exhibits into evidence was not an error of that description. Therefore, under the general rule that a document must be offered and admitted into evidence, and subject to an exception we discuss below, it was error for the court to consider JKE's documents as evidence.

¶ 24 Also, there was no conceivable way that the trial court could "admit" into the appellate record documents that had not been marked as trial exhibits and admitted at trial. The order was not an innocuous housekeeping order, as JKE argues. Rule 321 provides that the record on appeal consists of the judgment appealed from, the notice of appeal, and the entire original common-law record. Ill. S. Ct. R. 321 (eff. Feb. 1, 1994). The common-law record includes every document filed and judgment and order entered in the cause "and any documentary exhibits offered and filed by any party." Ill. S. Ct. R. 321 (eff. Feb. 1, 1994). As JKE did not mark or offer its exhibits into evidence at trial, the trial court had no authority to order that those documents be included in the record on appeal. The appellate court cannot consider documents that were not admitted into evidence at trial. *People v. Blankenship*, 406 Ill. App. 3d 578, 590 (2010).

¶ 25 Furthermore, the court lost jurisdiction to enter such an order when the notice of appeal was filed. Orders entered after the filing of the notice of appeal are valid if the substantive issues on appeal are not altered so as to present a new case to the appellate court. *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 162 (1998). Here, the trial court sought to alter the issues on appeal by designating documents that were not admitted at trial as evidence. Nor do we see in the common-law record where the court gave the parties notice of its entry of the order.

¶ 26 Nevertheless, we do not believe that all of JKE's exhibits should have been disregarded by the trial court. Because JKE sued for breach of a written contract or, in the alternative, for account stated, section 2-606 of the Code of Civil Procedure (735 ILCS 5/2-606 (West 2014)) required JKE to attach to the complaint the documents upon which it relied. Under section 2-606, a written instrument attached to a pleading as an exhibit constitutes part of the pleading for all purposes and need not be introduced into evidence to be considered. *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849, ¶ 33. The written contract, the notice advising Mary Ann of the rate hike to $1000, the "account reconciliation" showing an open balance of $7358.73 as of October 31, 2015, 10 paid invoices at the $950 monthly rate, 2 paid invoices at the $1000 monthly rate, and 7 unpaid invoices at the $1000 monthly rate were attached to the complaint. Mary Ann's answer admitted the existence of the written contract, the account reconciliation, and the invoices at the $1000 rate.

Therefore, those documents were properly considered by the trial court. See *Lipschultz v. So-Jess Management Corp.*, 89 Ill. App. 2d 192, 199-200 (1967) (lease and riders attached to complaint and admitted by the answer were properly considered by the court even though the documents were not admitted into evidence). We note that the rules of evidence in small-claims cases are relaxed. Ill. S. Ct. R. 286(b) (eff. Aug. 1, 1992). However, relaxed does not mean nonexistent, especially where both sides are vigorously represented by attorneys.

¶ 27    Next, Mary Ann argues that sections A and B of JKE's brief should be stricken for failure to support the arguments with citations of relevant authorities. Illinois Supreme Court Rule 341(h)(7) (eff. Jan. 1, 2016) requires parties to support their contentions with citations of authorities. Mary Ann asserts that section A of JKE's brief contains no citations of authorities and that section B cites just one case, which is inapplicable. Section A is in the nature of an introductory paragraph, summarizing JKE's argument, so we see no violation of the rule. The first part of section B argues that Mary Ann forfeited the issue that JKE did not introduce its exhibits into evidence. JKE cites *Maple v. Gustafson*, 151 Ill. 2d 445 (1992), in support of this argument. *Gustafson* addressed when a court may direct a verdict or enter a judgment *n.o.v.*, and it is inapposite here. However, having dealt with the forfeiture argument above, we will not strike this portion of section B. The remainder of section B essentially argues that David made no "express" or "written" direction to JKE to apply the second $10,000 wire transfer payment to the Hidden Knoll account. JKE cites no authority for the proposition that such direction has to be either express or written. Consequently, that argument is forfeited. Contentions supported by some argument but by absolutely no authority do not meet the requirements of Rule 341(h)(7), and we will treat the argument as having been procedurally defaulted. *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 720 (2010).

¶ 28    Turning to the merits, Mary Ann argues that (1) the judgment was against the manifest weight of the evidence and (2) the trial court erred when it failed to direct a finding in her favor. JKE contends that Mary Ann did not specify in her notice of appeal that she was appealing the directed-finding ruling. Generally, when an appeal is taken from a specified judgment, the appellate court acquires no jurisdiction to review other judgments or parts of judgments not specified in or inferred from the notice of appeal. *McGill v. Garza*, 378 Ill. App. 3d 73, 75 (2007). The exception is when a nonspecified judgment is a step in the procedural progression leading to the judgment specified. *McGill*, 378 Ill. App. 3d at 75. Here, Mary Ann's notice of appeal specified the September 7, 2016, final judgment. The denial of the motion for a directed finding was obviously a step in the procedural progression leading to the final judgment. Accordingly, we have jurisdiction.

¶ 29    Where a debtor makes a payment to a creditor to whom he or she is indebted on several accounts, the debtor has the right to indicate the item to which the payment shall apply. *Village of Winfield v. Reliance Insurance Co.*, 64 Ill. App. 3d 253, 257-58 (1965). If the debtor does not so indicate, the creditor ordinarily can select to which item it will apply the payment. *Village of Winfield*, 64 Ill. App. 3d at 258. When the parties have agreed how payments should be applied, the law need look no further. *American National Bank & Trust Co. of Chicago v. Mack*, 311 Ill. App. 3d 583, 587 (2000); *Reconstruction Finance Corp. v. McCormick*, 102 F.2d 305, 315 (7th Cir. 1939) (it is elementary that, in the absence of an agreement, the creditor may apply payments to any obligation that he or she holds). The agreement is equivalent to a direction by the debtor as to the application. *Saffer v. Lambert*, 111 Ill. App. 410, 412 (1903).

The expression of a *wish* on the part of the debtor as to how a payment should be applied amounts to a direction to that effect. *Hansen v. Rounsavell*, 74 Ill. 238, 240-41 (1874).

¶ 30    Mary Ann maintains that Knowles agreed that David would pay the Florida bill after Zidane was sold. Mary Ann principally relies on Knowles's testimony that David asked for a bill for the Florida services so that it could be paid after Zidane was sold. Knowles testified that Zidane was sold on March 26, 2015. Because Zidane was sold after David made the March 21, 2015, wire transfer, Mary Ann concludes that JKE improperly used the money to satisfy the Florida debt. Therefore, Mary Ann argues, the trial court's finding that JKE was entitled to apply the money to the Florida debt was against the manifest weight of the evidence. For a judgment to be against the manifest weight of the evidence, conclusions opposite those reached by the trier of fact must be clearly evident. *Wood v. Illinois Liquor Control Comm'n*, 55 Ill. App. 3d 228, 231 (1977).

¶ 31    JKE argues that Knowles did not know what she was saying when she answered "yes" when asked on direct examination whether David asked for the Florida bill so that it could be paid after Zidane was sold. That argument is not supported by the record. The question was not confusing to a lay person, as JKE suggests. The question was simply whether David told Knowles that he would pay the Florida bill after Zidane was sold. JKE asserts that Knowles's testimony did not establish her agreement to hold the Florida bill until after Zidane was sold. Knowles's testimony tended to corroborate David's testimony that there was such an agreement. Knowles could have denied the understanding in rebuttal, but she did not. Next, JKE argues that there was no proof of when Zidane was sold. That statement also is not supported by the record. Knowles testified on direct examination that the horse was sold on March 26, 2015.

¶ 32    Mary Ann further argues that, even in the absence of an agreement, JKE was obligated to apply the second payment to the Hidden Knoll bill, because (1) it worked an injustice to apply it to the Florida bill and (2) the Florida bill was not yet due when David sent the second payment. JKE disputes both of those propositions.

¶ 33    Despite the scorched-earth approach taken by the parties, this case is not factually or legally complicated. Mary Ann had a substantial outstanding balance on the Hidden Knoll account in February 2015, when Zidane was shipped to Florida. David testified that he and Knowles had an understanding that the Florida bill would be paid after Zidane was sold. Not only did Knowles not dispute this, she confirmed it in her own testimony when she agreed that David asked for the Florida bill so that it could be paid after the horse was sold.

¶ 34    Also, the record establishes that David intended his wire payments to be applied to the Hidden Knoll debt and that Knowles understood this intention. Knowles's demands for payment in February 2015, and her threat to initiate legal action, related to the Hidden Knoll bill. On February 25, 2015, Knowles texted David that her attorney would begin "the lien process." On February 26, 2015, David instructed his bank to wire $10,000 to JKE, which JKE applied to the Hidden Knoll balance. Knowles confirmed in a text message to David that JKE received the funds, and she pleaded with him to pay the rest of the bill. On March 21, 2015, David instructed his bank to wire another $10,000 to JKE. The requests for payment, and the payments, all related to the Hidden Knoll bill. From David's perspective, the application of the payments to the Hidden Knoll bill was critical because of Mary Ann's liability for JKE's attorney fees. The fee-shifting provision in the written contract did not apply to the Florida bill. Further, the Florida bill, dated March 17, 2015, indicated that it would not be considered

overdue until the "fifth" of the month, necessarily meaning the *next* month, April 2015. Also, the horse was not yet sold when David made the second wire payment.

¶ 35    JKE relies on *B. Kreisman & Co. v. First Arlington Bank of Arlington Heights*, 91 Ill. App. 3d 847 (1980), and *Farm Credit Bank of St. Louis v. Biethman*, 262 Ill. App. 3d 614 (1994), for the general rule that when a debtor has several accounts with a creditor, a payment made by the debtor without direction to a specific account may be applied by the creditor to any account the creditor chooses. That proposition of law is not in dispute.

¶ 36    Here, the record establishes that the parties agreed that the Florida bill would be paid after Zidane was sold. Knowles testified that David told her that he would pay the Florida bill after Zidane was sold. Moreover, it is clear that Knowles was seeking payment of the Hidden Knoll bill, not the Florida bill. Accordingly, the trial court's judgment in JKE's favor was against the manifest weight of the evidence. Because we reverse that judgment, we must also hold that Mary Ann proved her affirmative defense of overpayment of the Hidden Knoll bill. The parties stipulated that there was a balance of $6575.34 on the Hidden Knoll account of $6575.34 as of March 15, 2015. On March 21, 2015, David caused $10,000 to be wired to satisfy the debt. Therefore, Mary Ann overpaid by $3424.66. Accordingly, we enter judgment in favor of Mary Ann and against JKE in the amount of $3424.66. Having determined that the judgment in JKE's favor was against the manifest weight of the evidence, we do not reach the issue of whether Mary Ann's motion for a directed finding should have been granted.

¶ 37                            B. JKE's Cross-Appeal

¶ 38    Paragraph 6 of the written contract provided that Mary Ann agreed to pay JKE all costs, including reasonable attorney fees, that JKE incurred in enforcing the agreement. Pursuant to that provision, JKE seeks in excess of $23,000 in attorney fees, even though at trial it agreed to accept the amount awarded by the trial court. Because we reverse the judgment in JKE's favor, we vacate the judgment granting JKE attorney fees.

¶ 39                            III. CONCLUSION

¶ 40    For the foregoing reasons, the judgment in favor of JKE and against Mary Ann is affirmed in part and reversed in part. The award of attorney fees to JKE is vacated.

¶ 41    Affirmed in part and reversed in part; attorney-fee award vacated.