2022 IL App (2d) 210508-U
No. 2-21-0508
Order filed January 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.P., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Boone County. |
| | ) | |
| | ) | No. 18-JA-11 |
| | ) | |
| (People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. Monisha R., Respondent- | ) | Janet R. Holmgren, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in finding respondent unfit and that it was in the minor's best interests to terminate respondent's parental rights. Although the State did not formally offer its exhibits into evidence at the unfitness hearing, the trial court properly considered them where respondent raised no objection and acquiesced to their admission without foundation, and the court entered an order admitting them into evidence. The court's best-interests finding was not against the manifest weight of the evidence.

¶ 2    The trial court found respondent, Monisha R., to be an unfit parent and determined that it

was in the best interests of respondent's minor son, A.P., to terminate respondent's parental rights.[1]

---

[1] The court also terminated the parental rights of William P., A.P.'s father.  William P. is

Respondent appeals, arguing that the court's findings were against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On June 16, 2018, the Department of Children and Family Services (DCFS) received a hotline call following a domestic incident at respondent's residence. Respondent, who was intoxicated, had been physically fighting with her sister, while two-year-old A.P. was present. During the altercation, respondent broke a large window. When police arrived, respondent was hiding, and the officers observed A.P. standing near the broken glass. Respondent initially resisted when officers attempted to arrest her, but she was ultimately taken into custody.

¶ 5     On September 7, 2018, the State filed a neglect petition alleging that A.P.'s environment was injurious to his welfare, and thus, placed him at risk of harm, in that (1) respondent engaged in acts of domestic violence while A.P. was present, (2) respondent resisted a police officer while holding A.P. in her arms during her arrest, and (3) respondent had ongoing alcohol and substance abuse problems that prevented her from properly parenting A.P.

¶ 6     After two continuances, both due to respondent appearing in court with alcohol in her system, the court held an adjudicatory hearing on January 17, 2019. Respondent stipulated that she had an ongoing alcohol problem that prevented her from "properly seeing to" A.P. The trial court adjudicated A.P. a neglected minor and granted DCFS custody and guardianship. DCFS placed A.P. in the care of his maternal grandfather, Clifton L.

¶ 7     Over the next approximately two and a half years, the court held several permanency review hearings. At these hearings, the court received DCFS service plans that identified tasks

_____

not a party to this appeal, and his parental rights are not at issue.

that respondent needed to complete to achieve reunification with A.P. and rated her progress in completing those tasks. The court also received reports prepared by Children's Home and Aid Society of Illinois (CHASI) caseworkers that detailed respondent's progress in achieving the tasks. The service plans and CHASI reports were filed with the court prior to their respective permanency review hearings. Samantha Hagerman was the family's caseworker through July of 2019, and she prepared the CHASI reports up to that time. Amy Block succeeded Hagerman as the family's caseworker, and she prepared the subsequent reports.

¶ 8 The court commenced the first permanency hearing on June 27, 2019. Hagerman's CHASI report indicated that respondent's efforts in completing recommended services were "overall unsatisfactory." Since the date of adjudication, respondent failed to complete several "drug drops." Of those "drug drops" that she completed, one was negative for substances, one was positive for alcohol, and one was positive for marijuana. Further, respondent had not yet engaged in recommended services, including a substance abuse program, individual therapy, and domestic violence services. The reason for that was that respondent was still "trying to get a bed for inpatient [treatment] at Rosecrance," and she could not be referred to the additional services until she was "clean of all substances." The court continued the remainder of the hearing and reserved making any findings regarding reasonable efforts or reasonable progress.

¶ 9 The permanency hearing recommenced on July 25, 2019. An update to Hagerman's CHASI report indicated that, per a substance abuse assessment, respondent needed to complete treatment in an intensive outpatient program (IOP). Respondent began attending IOP treatment at Remedies Renewing Lives (Remedies), but she was "in jeopardy of being discharged," because she had attended only 13 of 34 group sessions. The court found that the appropriate permanency

goal was A.P.'s return home within twelve months, but that respondent had not made reasonable efforts or progress toward A.P.'s return.

¶ 10    The next permanency hearing commenced on January 16, 2020. The court reviewed the CHASI report prepared by Block but continued the matter and reserved making findings on respondent's efforts or progress.

¶ 11    The permanency hearing recommenced on February 20, 2020. Block's CHASI report provided that respondent "has not been compliant with the agency throughout the last review period." Respondent was unsuccessfully discharged from the IOP at Remedies due to her lack of attendance. She was put on a waitlist to participate in an IOP at Rosecrance and instructed to call Rosecrance weekly to remain on the waitlist. Respondent, however, was not calling consistently. Additionally, from May of 2019 until December 11, 2019, respondent "did not appear for any of her random drug drops." Respondent, still, could not be referred to additional services "until she maintain[ed] a period of sobriety." The court found that respondent had not made reasonable efforts or reasonable progress.

¶ 12    The court held the next permanency hearing on August 6, 2020. Block reported that respondent began participating in an IOP at Rosecrance, but that she "is often late and sometimes not actively participating during the sessions." The court found that respondent had not made reasonable efforts or reasonable progress.

¶ 13    The next permanency hearing occurred on January 14, 2021. Block's CHASI report noted that respondent had completed the second phase of IOP treatment. Respondent's counsel clarified that respondent had been successfully discharged from treatment. Counsel acknowledged, however, that because respondent had not reached 60 days of sobriety, other services were still "on hold." Accordingly, the court found that respondent had made reasonable efforts, but not

reasonable progress, toward returning A.P. Because A.P. had been in care for nearly two and a half years, the court changed the permanency goal to "substitute care pending determination of termination of parental rights."

¶ 14    On February 22, 2021, the State filed a motion for termination of parental rights. The motion alleged that respondent was unfit, as follows: (count I) she failed to maintain a reasonable degree of interest, concern, or responsibility as to A.P.'s welfare (750 ILCS 50/1(D)(b) (West 2018)), (count II) she failed to make reasonable efforts to correct the conditions which were the basis for A.P.'s removal during any nine-month period following the January 17, 2019, neglect adjudication (750 ILCS 50/1(D)(m)(i) (West 2018)), (count III) she failed to make reasonable progress toward the return of A.P. during any nine-month period following the January 17, 2019, neglect adjudication (750 ILCS 50/1(D)(m)(ii) (West 2018)), and (count IV) she failed to protect A.P. from conditions within respondent's environment injurious to A.P.'s welfare (750 ILCS 50/1(D)(g) (West 2018)). The motion further alleged that it was in A.P.'s best interests to terminate respondent's parental rights.  The court scheduled an unfitness hearing for May 27, 2021, and a best-interests hearing for June 24, 2021.

¶ 15    On May 27, 2021, respondent appeared for the scheduled hearing via video call because she was in custody in Winnebago County.  The State filed a petition identifying the relevant nine-month periods pertaining to counts II and III as January 18, 2019, through October 18, 2019, and October 19, 2019, through July 19, 2020. Thereafter, the State noted its intent to present, as exhibits, the DCFS service plans and CHASI reports that had been filed with the court for the permanency review hearings.  The following colloquy occurred:

"[STATE]: And I did prepare a potential State exhibit list and maybe [respondent's counsel] could – it's People's Exhibits 1 through 8. Maybe [respondent's counsel] could address those exhibits.

[RESPONDENT'S COUNSEL]: *** And as far as the potential State exhibits go, the State has prior to today given notice on what exhibits would be their potential State exhibits. Quite frankly, as far as foundation goes, I would not object to the admission of the exhibits as far as the service plans and the CHASI reports that the State is requesting. Quite frankly, most of our argument – there will be a little bit of testimony I believe from [respondent], but the law is very I'd say against us on this and most of our case most likely will be saved for the best interest date, which has already been set. So while we're not stipulating to the actual counts, we would at least waive any objection to any foundational requirements as far as the exhibits go."

The court then addressed respondent's absence and determined that, "for the integrity of the court proceedings[,] we should defer going into the proofs today." The court provided, however, that, given the "acknowledgement" of the State's documents, "we can start the hearing today to the extent that if you want to admit your exhibits based on this lack of objection to foundation." Respondent raised no objection, and the State answered, "I think that that's probably the best way to go." The court subsequently entered an order continuing the proceedings to June 24, 2021, and providing that "People's Exhibits 1 – 8 are admitted, no objection."

¶ 16    On June 24, 2021, the court held an unfitness hearing. Before the State called its first witness, respondent's counsel reminded the court that "we had a stipulation as far as evidence on the termination part, and we just have argument regarding that." The State noted that it "intended to call the two caseworkers that were assigned to the case during the nine-month period of time

that I alleged to just briefly talk to them about the exhibits that have already been entered." Respondent, again, raised no objection.

¶ 17   The State then called Hagerman.  Hagerman testified that she was a foster care case manager for CHASI and worked on A.P.'s case from September 2018 to July 2019. Hagerman identified Exhibit 1 as a service plan that she developed, and Exhibits 5 and 6 were CHASI reports that she prepared for the June 27, 2019, and July 25, 2019, permanency review hearings. Hagerman testified that, from January 2019 through July 2019, respondent was rated "unsatisfactory" as to her efforts to obtain substance abuse treatment.  Respondent failed to appear for approximately half of the random "drug drops" she was asked to participate in, tested positive for marijuana on one occasion, and tested positive for alcohol on another. Additionally, respondent's visitation with A.P. from January 2019 to July 2019 "was inconsistent."  On cross-examination, respondent's counsel referred Hagerman to Exhibit 6 and asked her if she was aware that the July 25, 2019, permanency report indicated that respondent was "having difficulty with transportation" and "difficulty with understanding" the content of the treatment.  Hagerman responded, "If that is what the report says, then this would be accurate."

¶ 18   The State then called Block.  Block testified that she was a foster care caseworker for CHASI and was assigned to A.P.'s case in July 2019. Block identified Exhibits 2, 3, and 4 as service plans that she prepared over six-month intervals after being assigned to A.P.'s case. In August 2019 respondent's progress was rated as "unsatisfactory."  Block's "main concern" at that time was respondent's "sobriety." Moreover, "there were additional services including counseling, anger management and parenting education" that respondent had not completed, as she could only be referred for them if she maintained her sobriety for 60 days. From July 2019 through July 2020, respondent did not successfully complete any inpatient substance abuse treatment program, and

the "drug drops" during that time "were considered positive due to [respondent's] failure to appear." Additionally, although Block recommended that respondent visit with A.P. for at least three hours per week, respondent usually visited for only "one to two hours."

¶ 19    Respondent did not testify or present any witnesses. Respondent's counsel argued, in closing, that the court should consider the "part of the reports that [were] entered into evidence" that indicated that respondent suffered from transportation and poverty issues, which hindered her ability to seek treatment. The court asked the State for Exhibits 1 through 8, which the State provided, then explained that it would take the matter under advisement to review them.

¶ 20    On July 15, 2021, the court found respondent to be unfit. The court found that, from "January 17, 2019, to October 17, 2019," and "beyond," respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of A.P. from her care and failed to make reasonable progress toward the return of A.P. The court explained that it relied on testimony that respondent failed to comply with substance-abuse-disorder treatment, failed several "drug drops," had "uneven" visitation with A.P., and was unable to engage in other required services due to her lack of sobriety.

¶ 21    Thereafter, the court held a best-interests hearing. The State once again called Block. Block testified that A.P. had been placed with his maternal grandfather, Clifton, since June 2018, and that A.P. lived with him prior to that "on and off." A.P. had his own room in Clifton's home. Clifton's girlfriend, Tamika K., and her two children also lived at the residence. A.P. had known Clifton his whole life and had a "very positive" relationship with him. A.P. and Clifton had "a very strong bond." A.P. looked to Clifton "very affectionately," and Clifton, in turn, spontaneously gave affection to A.P. Clifton was "the main caregiver," disciplinarian, and comforter. When A.P. first came to Clifton's home, A.P. was not potty trained, so Clifton signed him up for a daycare that

worked on potty training him. Once A.P. began attending school, Clifton helped A.P. with homework and attended school meetings. Moreover, A.P.'s relationship with Tamika K.'s children was going "very well," and they were "very comfortable with each other." Clifton had indicated that he was willing to give a permanent adoptive home to A.P. Clifton intended to continue allowing respondent to be a part of A.P.'s life and to include her in decisions for things like A.P.'s schooling, holidays, and birthdays. Block believed that A.P. was in a safe environment with a caregiver who loved him and who was fully meeting all of his medical, educational, food, and shelter needs. Block thus believed that it was in A.P.'s best interests to remain there. On cross-examination, Block noted that she observed respondent and A.P. "over Zoom a couple times when we were doing Zoom visits." Block acknowledged that there was affection between respondent and A.P. and that respondent "was able to redirect [A.P.] appropriately if he was doing something he shouldn't do."

¶ 22 The court continued the remainder of the hearing until August 5, 2021. On that date, respondent did not appear. The State called Clifton. Clifton testified that A.P. had lived with him for approximately four years. His relationship with A.P. was "great," and he loved A.P. He provided "all the essentials" for A.P., including a roof over his head. Clifton acknowledged that A.P. had a "good" relationship with respondent and that he was interested in allowing A.P. to maintain a positive relationship with her. On cross-examination, Clifton noted that respondent helped provide for A.P. by buying clothes and toys. Respondent would be capable of raising A.P. if she "really set[] her mind to it," but she was not able to do so right now because there were "things she need to get [*sic*] herself together." Instead, he and Tamika K. took care of everything for A.P. on a day-to-day basis and had done so for four years. He agreed that he provided a more

stable environment for A.P. and that he was willing to provide permanency for A.P. by adopting him.

¶ 23    The trial court found that it was in A.P.'s best interests to terminate respondent's parental rights, based upon its "consideration of where [A.P.] has been physically safe and his welfare and providing for food, shelter, health and clothing." Additionally, the court found that A.P. is "integrated into [Clifton]'s household, and that is part of the development of his identity." Further, the court found that Clifton's background and ties to respondent would permit respondent's supervised access to A.P., such that there would be no disruption of that relationship "unless it becomes problematic." The court noted that "every report that I ever reviewed is just replete with references to how loved [A.P.] is, how self-confident he is, [and] how well he is doing," which "plays into his sense of security, sense of familiarity, and definitely the least disruptive placement alternative." The court believed that, given A.P.'s placement with Clifton "for all of the pendency of these proceedings," A.P. would want to remain in his care. Accordingly, the trial court terminated respondent's parental rights. Respondent timely appealed.

¶ 24                                   II. ANALYSIS

¶ 25    Respondent argues that the trial court's findings as to both parental unfitness and A.P.'s best interests were against the manifest weight of the evidence.

¶ 26    Involuntary termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) is a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The State must first prove by clear and convincing evidence that the parent is unfit under any one ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *C.W.*, 199 Ill. 2d at 210. If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor

to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 352, 366 (2004). A reviewing court accords great deference to the trial court's decisions in termination proceedings because the trial court is in the better position to observe witnesses and to judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. This court will not disturb a trial court's findings of parental unfitness or the child's best interests unless they are contrary to the manifest weight of the evidence. *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence. *J.C.*, 2020 IL App (2d) 200063, ¶ 27.

¶ 27                                                        A. Unfitness

¶ 28    Respondent first argues that the trial court's finding that she is unfit is against the manifest weight of the evidence. Specifically, respondent claims that, because the State "failed to properly admit" Exhibits 1 through 8—the service plans and CHASI reports—by formally offering them into evidence, there was no competent evidence of her unfitness.[2]

¶ 29    Initially, the State argues that respondent forfeited this issue because she did not raise it in the trial court by making an objection. See *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 50 (an issue is forfeited on appeal where it is not objected to during trial). Respondent counters that, because the State did not formally offer its exhibits, and "the court did not admit them," there "was never a time [she] could have objected." The record belies respondent's argument. The trial court's continuance order, filed on May 27, 2021, clearly noted, "People's Exhibits 1-8 are admitted, no objection." At no point did respondent object to the admission of the exhibits or otherwise raise

---

[2] Respondent makes no argument that the unfitness finding would be against the weight of the evidence if the exhibits were properly admitted.

the issue to the trial court. Accordingly, respondent forfeited this issue. See *In re J.J.*, 201 Ill. 2d 236, 248 (2002) (issue raised for the first time on appeal was not preserved).

¶ 30    Respondent nevertheless asks this court to review this issue under the plain-error doctrine. Under the plain-error doctrine, a reviewing court may consider an unpreserved error where either (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and the error is so serious that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *Z.J.*, 2020 IL App (2d) 190824, ¶ 51. "Before we determine whether plain error occurred, however, we must first determine whether any error occurred at all." *Z.J.*, 2020 IL App (2d) 190824, ¶ 51. "If clear or obvious error did not occur, no plain error analysis is necessary." *Z.J.*, 2020 IL App (2d) 190824, ¶ 51.

¶ 31    Here, we need not engage in a plain-error analysis, because we conclude that the trial court committed no error in admitting and considering the State's exhibits. See *Z.J.*, 2020 IL App (2d) 190824, ¶ 51 ("In this case, we need not engage in a plain error analysis, as we find that no error occurred with respect to the admission of the service plans or Mayzes's testimony.").

¶ 32    Generally, "a document must be offered by its proponent and admitted into evidence by the trial court before it may be considered as evidence." *People v. One 1999 Lexus, VIN JT8BH68X2X0018305*, 367 Ill. App. 3d 687, 689 (2006). "It is error to permit the trier of fact to consider documents that have not been tendered or admitted into evidence." *One 1999 Lexus*, 367 Ill. App. 3d at 689. "[T]he primary purpose of this rule is to give the opposing party an opportunity to object to the document before the court rules." *One 1999 Lexus*, 367 Ill. App. 3d at 690. However, an exception to the "requirement of formal admission of documents" has been

recognized "where the opposing party stipulates to their admission." *One 1999 Lexus*, 367 Ill. App. 3d at 690. This is because, at a minimum, the opposing party does not object to the proffered materials. *One 1999 Lexus*, 367 Ill. App. 3d at 693.

¶ 33    Respondent relies on *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, to argue that the trial court's May 27, 2021, order admitting Exhibits 1 through 8 was erroneous because the State never formally offered those documents into evidence, and therefore, the trial court should not have considered them. But *Jill Knowles* is distinguishable. In *Jill Knowles*, the plaintiff and defendant entered into a written contract for the boarding of the defendant's horse. *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 3. After the defendant became delinquent in the payment of fees under the contract, the plaintiff sued; attached to the complaint were the contract and certain invoices showing the defendant's paid and unpaid amounts. *Jill Knowles*, 2017 IL App (2d) 160811, ¶¶ 3, 7. At trial, the plaintiff's counsel questioned the defendant about the documents attached to the complaint and additional unpaid invoices. *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 9. Counsel, however, did not mark any documents as trial exhibits or give any indication that he sought to admit any documents into evidence. *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 9. The trial court entered a judgment in the plaintiff's favor, and approximately two months after a notice of appeal was filed, the trial court entered an order purporting to admit "all exhibits into evidence for purpose of appeal." *Jill Knowles*, 2017 IL App (2d) 160811, ¶¶ 9, 17. We held, *inter alia*, that the trial court erred in considering, as evidence, any documents beyond the contract and invoices attached to the plaintiff's complaint. *Jill Knowles*, 2017 IL App (2d) 160811, ¶¶ 23, 26. We reasoned that the trial court could not, by *nunc pro tunc* order two months after the notice of appeal had been filed, retroactively admit unspecified and unmarked documents that were neither offered by the plaintiff nor admitted into evidence at trial. *Jill Knowles*, 2017 IL App (2d) 160811,

¶ 23. Such an omission was not the type of "inadvertent clerical error" that such an order could remedy. *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 23. Additionally, since the appellate court could not consider unmarked and unadmitted documents, the trial court could not order that the documents be included in the record on appeal. *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 24. Finally, the trial court had no jurisdiction to enter its order once the notice of appeal was filed, because the order improperly sought to alter the issues on appeal by designating unmarked and unadmitted documents as evidence. *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 25.

¶ 34    By contrast, in this case, the State marked the service plans and CHASI reports as Exhibits 1 through 8. On May 27, 2021, the State informed the court that it sought to admit its exhibits, and respondent's counsel, having seen them, announced that there was no objection to their admission. The trial court entered its written order noting that the exhibits were admitted, with "no objection," that day. Respondent's counsel, in turn, used the exhibits in questioning a witness, referred to them as having been the result of a "stipulation" and "entered into evidence," and encouraged the trial court to consider them during closing argument. Thus, unlike *Jill Knowles*, the trial court's order memorialized the parties' understanding that the exhibits had been admitted without objection. It was neither a misplaced attempt to correct a "clerical error," nor an attempt to alter any issue on appeal by purporting to retroactively admit unspecified, unmarked documents two months after a notice of appeal had been filed.

¶ 35    This case more closely resembles *One 1999 Lexus*, which we find instructive.  In *One 1999 Lexus*, the State filed a petition seeking forfeiture of the claimant's vehicle, alleging that the claimant allowed his grandson to drive it while knowing that the grandson's license had been suspended or revoked because of a prior DUI conviction.  *One 1999 Lexus*, 367 Ill. App. 3d at 687-88.  At the hearing on the petition, the State referred to various documents, including the

indictment and sentencing order in the grandson's underlying case, and the claimant's counsel responded, "We will stipulate." *One 1999 Lexus*, 367 Ill. App. 3d at 688. The indictment alleged that the grandson's license had been suspended or revoked because of a prior DUI conviction, and the sentencing order showed that the grandson was found guilty of that offense. *One 1999 Lexus*, 367 Ill. App. 3d at 688. Although the prosecutor tendered these documents to the trial court, he never asked the court to admit them into evidence. *One 1999 Lexus*, 367 Ill. App. 3d at 689. The State called three police officers, who testified that the grandson had been arrested three times for DUI, including the arrest that led to the underlying case. *One 1999 Lexus*, 367 Ill. App. 3d at 688. The claimant, in turn, testified that he knew that his grandson had previously pleaded guilty to DUI. *One 1999 Lexus*, 367 Ill. App. 3d at 688. The trial court ordered the vehicle forfeited. *One 1999 Lexus*, 367 Ill. App. 3d at 688.

¶ 36    On appeal, the claimant argued that the State failed to prove that a DUI conviction was the reason that the grandson's license had been suspended or revoked, because the State's documents showing as much were never formally introduced into evidence. *One 1999 Lexus*, 367 Ill. App. 3d at 689. This court rejected that argument. *One 1999 Lexus*, 367 Ill. App. 3d at 693. We noted that the "claimant's stipulation meant, at a minimum, that he did not object to" the documents, thus "dispensing with the need for a formal presentation." *One 1999 Lexus*, 367 Ill. App. 3d at 691, 693. Thus, the claimant "waive[d] the formal requisites of admission," such that "there was no need for the prosecutor to formally introduce the documents into evidence or for the trial court to formally admit them." *One 1999 Lexus*, 367 Ill. App. 3d at 691, 693. Accordingly, we concluded that the trial court "did not err in considering the documents despite the lack of a formal action admitting them into evidence." *One 1999 Lexus*, 367 Ill. App. 3d at 693. We further noted that, in any event, testimony from the officers and claimant about the grandson's prior DUI arrests and

conviction was sufficient for the trial court to find that his license had been suspended or revoked due to a DUI conviction. *One 1999 Lexus*, 367 Ill. App. 3d at 693.

¶ 37    Like *One 1999 Lexus*, the State gave respondent's counsel notice of the documents that it intended to present as exhibits. Those documents detailed respondent's deficiencies in seeking substance abuse treatment, complying with "drug drops," and maintaining consistent visitation with A.P. Counsel explicitly stated that he "would not object to the admission of *** the service plans and the CHASI reports." The court entered an order admitting Exhibits 1 through 8, with "no objection" from respondent, and respondent raised no objection to that order. To the contrary, respondent's counsel referred to the exhibits as being the result of "a stipulation as far as evidence on the termination part." We hold that, by explicitly waiving any objection to the admission of the State's service plans and CHASI reports, counsel waived the formal requisites of their admission into evidence.  Accordingly, the trial court did not err in considering Exhibits 1 through 8, despite the absence of a formal action from the State offering them into evidence.

¶ 38    We further note that, in any event, Hagerman's and Block's testimony independently established that, from January 2019 through at least July 2020, respondent did not successfully complete any inpatient substance abuse treatment program. Thus, respondent could not commence additional services due to her lack of sobriety. Additionally, respondent failed to appear for several "drug drops" and tested positive for substances at other "drug drops." Further, respondent did not engage in consistent visitation with A.P. This testimony, which the trial court mentioned in its ruling, independently supported the court's finding that respondent is unfit. See *One 1999 Lexus*, 367 Ill. App. 3d at 693 (testimonial evidence established, independent of documents, that grandson's license was suspended or revoked due to DUI conviction). Accordingly, respondent cannot show that the trial court committed a clear or obvious error.

¶ 39 Finally, even assuming, *arguendo*, that the trial court should not have admitted and considered the State's exhibits, counsel invited or acquiesced to their admission by (1) waiving any objection to their admission, (2) failing to raise his claim that they had not been formally offered into evidence with the trial court, (3) acknowledging that they were the result of a "stipulation" and had been entered, (4) using an exhibit while questioning a witness, and (5) encouraging the trial court, during closing argument, to consider them. Under the rule of invited error or acquiescence, a party "cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Accordingly, respondent is entitled to no relief. *In re S.R.*, 2014 IL App (3d) 140565, ¶ 26 (respondent could not complain on appeal that psychiatrist's opinion that she was unable to parent a child was based on an interview that occurred too far in advance of termination hearing, where respondent had objected to the admission of updated mental health records at trial).

¶ 40                                             B. Best Interests

¶ 41 Respondent next argues that the trial court's finding that the termination of her parental rights was in A.P.'s best interests is against the manifest weight of the evidence.

¶ 42 Following a finding of unfitness, "the focus shifts to the child." *D.T.*, 212 Ill. 2d at 364. At that stage, the court considers whether it is in the best interests of the child to terminate parental rights. *D.T.*, 212 Ill. 2d at 352. Section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)) sets forth several factors for the trial court to consider in assessing a minor's best interests. These factors include (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) the minor's familial, cultural, and religious background; (4) the minor's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the

minor's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). The trial court, however, need not explicitly reference every factor in rendering its decision. *Z.J.*, 2020 IL App (2d) 190824, ¶ 74.

¶ 43    Respondent argues that the trial court's best-interests finding was against the manifest weight of the evidence because the evidence established that, by the termination hearing, she had achieved significant control of her substance abuse issues. She asserts that, aside from a small set of services that she needed to complete, she was very close to being able to properly care for A.P. At the best-interests stage, however, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *D.T.*, 212 Ill. 2d at 364. "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *D.T.*, 212 Ill. 2d at 364.

¶ 44    To that end, in finding that it was in A.P.'s best interests to terminate respondent's parental rights, the court noted that A.P. was "integrated into [Clifton]'s household, and that [was] part of the development of his identity." The court found that A.P. was physically safe with Clifton, who was "providing for [his] food, shelter health and clothing." Additionally, Clifton intended to allow A.P. to maintain contact with respondent, such that there would be no "disruption of that relationship unless it [became] problematic." Moreover, A.P. had been placed with Clifton during the pendency of the proceedings, such that the court believed that A.P. would want to remain in Clifton's care. Further, the court found that A.P. was loved and was self-confident, which "play[ed] into his sense of security, sense of familiarity, and definitely the least disruptive placement alternative."

¶ 45    We determine that the evidence amply supports the trial court's findings. Block testified that A.P. had known Clifton his whole life and had lived with Clifton since June 2018. Clifton was providing a safe environment for A.P. and meeting all of his needs, including his food, shelter, educational, and medical needs. They had "a very strong bond" and looked to each other "very affectionately." Similarly, A.P.'s relationship with Tamika K. and her children was going "very well," and they were "very comfortable with each other." Additionally, Clifton intended to continue allowing respondent to be involved in A.P.'s life.  Clifton, in turn, explained that he had a "great" relationship with A.P., who had lived with him for approximately four years, and that he provided A.P. with "all the essentials." He loved A.P. and was interested in adopting A.P. while allowing him to maintain a positive relationship with respondent.

¶ 46    In light of Block's and Clifton's testimony, we hold that the trial court's determination that it was in A.P.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 47                                    III. CONCLUSION

¶ 48    For the foregoing reasons, we affirm the judgment of the circuit court of Boone County.

¶ 49    Affirmed.