2024 IL App (2d) 230273-U
No. 2-23-0273
Order filed August 9, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF ELLEN MICHELI, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellant, | ) ) | |
| and | ) | No. 09-D-1256 |
| | ) | |
| JOHN MICHELI, | ) ) | Honorable Raymond D. Collins, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in denying petitioner's request to reopen the proofs or discovery upon remand from this court's mandate. The trial court's determination that maintenance should be terminated was an abuse of discretion as that determination was based on several factual findings that were against the manifest weight of the evidence. This court hereby enters an order granting petitioner's petition for extension of maintenance.

¶ 2                                    I. BACKGROUND

¶ 3   As this constitutes the fifth time this matter has been before this court on appeal, the record is quite voluminous. The following will recount only the facts relevant to the present appeal.

¶ 4    On June 28, 2012, the trial court entered a judgment for dissolution of marriage between the parties. At that time, both Ellen and John were 48 years old. The trial court found that maintenance was appropriate and ordered John to pay Ellen $3,700 per month for a period of seven years, plus 20% of any gross bonus received by John during the maintenance period. On October 9, 2012, the trial court issued a subsequent order clarifying the dissolution judgment. The trial court found that "the amount and duration of maintenance as set forth in the Judgment of Dissolution of Marriage shall stand. Maintenance shall be reviewable upon the Petition of Ellen Micheli so long as it is timely filed prior to *** June 30, 2019, if there is no delinquency at that time."

¶ 5    John appealed the judgment, challenging the amount and duration of maintenance. Ellen cross-appealed, arguing that maintenance should have been permanent. See *In re Marriage of Micheli*, 2014 IL App (2d) 121245 ("*Micheli I*").[1] As to John's appeal, this court held:

> "We agree with John that the maintenance award is an abuse of discretion to the extent that it includes an uncapped amount based on a percentage of his future bonuses. Ordering John to pay 20% of his bonuses as uncapped maintenance sets up a potential windfall for Ellen and has no evidentiary relation to her present needs or the parties' standard of living during the marriage. On remand, the trial court should recalculate the monthly maintenance amount or at least cap the amount from John's future bonuses. If the trial court determines that $3,700 per month is inadequate to meet Ellen's needs and

---

[1] During the pendency of *Micheli I*, John appealed an award of appellate attorney's fees to Ellen. This court affirmed the trial court's award. See *In re Marriage of Micheli*, 2015 IL App (2d) 140437-U ("*Micheli II*").

maintain her standard of living during the marriage, it may add a capped portion of John's future bonuses." *Micheli I*, 2014 IL App (2d) 121245, ¶ 25.

In denying Ellen's cross-appeal for permanent maintenance, this court held:

> "[T]he [trial] court's decision to forgo permanent maintenance *** was not an abuse of discretion. Ellen is a college graduate who previously worked in the insurance industry. At the time of the dissolution, she was healthy, 48 years old, and employed full-time. Moreover, she was awarded a substantial portion of the marital estate, which is a statutory factor tending to mitigate her need for maintenance. By denying permanent maintenance, the trial court implicitly determined that Ellen had not shown that, after seven years, she would be employable only at an income substantially lower than the previous standard of living. Based on the evidence presented at trial, the court's decision to deny permanent maintenance was not inequitable such that no reasonable person would take the view adopted by the court. [Citation]. *Micheli I*, 2014 IL App (2d) 121245, ¶ 30.

¶ 6 On remand, the trial court found that the $3,700 per month base maintenance was sufficient. Additionally, John's obligation to pay Ellen 20% of any gross bonus was subject to an income cap of $320,000. Both parties appealed again. Relevant here, Ellen argued that the trial court misapplied this court's mandate in *Micheli I* and failed to properly recalculate maintenance based on her reasonable needs rather than John's total income. *In re Marriage of Micheli*, 2017 IL App (2d) 150984-U, ¶ 16 ("*Micheli III*"). This court affirmed the trial court's maintenance findings, stating: "The capped maintenance that was ordered on remand is consistent with setting an amount that reflects Ellen's lifestyle during the marriage." *Id*. ¶ 34.

¶ 7 On May 30, 2019, Ellen filed her petition for review and extension of maintenance seeking an award in accordance with the statutory guidelines in both amount and duration. See 750 ILCS

5/504(b-1)(1)(A) (West 2018). Ellen requested an award of $4932 per month. Relevant here, the exhibits entered into evidence included (1) John's 2019 financial affidavit, (2) Ellen's 2011 financial affidavit, and (3) Ellen's 2020 financial affidavit. Prior to the hearing on Ellen's petition, John stipulated that he had the ability to pay any amount of reviewable maintenance.

¶ 8    At the time of the hearing, John was 55 years old. John testified that he had remarried and moved into a new marital home. His current wife had two children, one of whom was still a minor, and both children moved into the couple's marital home. He was a senior vice president of claims at Allstate Insurance Company (Allstate). His income in 2019 included a base salary of $320,000, a 2018 bonus that brought his income up to $640,000, a company 401(k) contribution match, dividends, and a $452 car allowance with every paycheck. Since the dissolution judgment, John had received additional compensation in the form of company stock. John's 2019 financial affidavit reflected that he owned assets valued in excess of $2.5 million and had a vested interest in a pension valued at approximately $7000 per month.

¶ 9    At the time of the hearing, Ellen was 56 years old. Ellen testified that at the beginning of the marriage, she and John held similar positions with Allstate. In 1997, they relocated due to John's position being transferred to Chicago. The parties agreed that Ellen would thereafter stay home to raise the children.

¶ 10    Ellen later reentered the workforce. In 2009, prior to the dissolution proceedings, Ellen was working at Stevenson High School as a part-time office assistant. Her pay in 2009 was $9500. "Right before the dissolution became effective," Ellen was offered a full-time position as a manager in the student services department. Her gross pay increased to $45,000.

¶ 11    Ellen went back to school and obtained a paralegal certification. After leaving Stevenson, she joined CDW Corporation in 2016 as a full-time legal administrative assistant. She was

subsequently promoted twice. At the time of the hearing, she was a proposal specialist with CDW. From 2016 through 2018, she also worked part-time as a food server at The Claim Company. Her total employment income in 2017 was $77,903 and in 2018 was "around" $77,000. In September 2018, she closed on a condominium with a purchase price of $647,500.

¶ 12    Over the previous seven years, Ellen paid taxes for the maintenance payments she received from John. She would "have to dip into [her] savings or assets" because she did not always have sufficient cash on hand to pay the taxes. To maintain her current living expenses, Ellen would have to liquidate her assets to supplement her employment income unless maintenance payments were extended.

¶ 13    Ellen had two benign tumors on her brain that caused a variety of symptoms, including brain fog, visual changes, daytime sleepiness, headaches, dizziness, insomnia, and elevated blood pressure. To manage her symptoms, she took some time off, worked fewer hours, and sometimes worked from home. Her income did not change due to these measures. At one point, however, she took a medical leave of absence from work of approximately three months, during which time her symptoms gradually improved and she "felt much better." Her income temporarily decreased during this time, but she eventually returned to working full-time. Nevertheless, since returning to work, her symptoms began to worsen again.

¶ 14    On cross-examination, Ellen acknowledged that she was working from home fully at the time of the review hearing. At the time of the dissolution trial in 2012, she had represented to the court that her monthly gross income was $1263.27. Her 2020 financial affidavit reflected that she owned a general investment account valued at approximately $500,000; an individual retirement account (IRA) and a health savings account (HSA) together valued at approximately $600,000; and cash and other assets valued at approximately $100,000. Ellen's retirement assets also included

interests in three different pensions which she would be able to access by age 65. Her cumulative pension benefits would exceed $6600 per month. Her financial affidavit further suggested that she has significant equity in her current residence.

¶ 15     The trial court classified the maintenance as "rehabilitative" and found as follows:

> "What are the efforts in rehabilitation that have been made by the Petitioner? She received her court reporter certification. She testified that she has a job at CDW and she's been promoted, and she testified on direct that she was a rising star. She's mitigated—she's done a lot to mitigate her need for the maintenance.
>
> She received about 1.335 million in deferred compensation at the divorce. The last check, her earned and passive income was between 80 and $100,000.
>
> There was a question about her health, but there was never any evidence that she could not work, except for the time that she took off.
>
> While the testimony supports that she has done a lot to rehabilitate herself, she's worked years outside the home, she's completed the rehabilitation education. As she said, she's a rising star at CDW. She received technical training for advancement in her career.
>
> And the Court is going to rule that there's no longer a need for financial support to enjoy the standard of living enjoyed during the marriage. And that is based on, honestly, her efforts to rehabilitate herself to no longer be dependent on Mister for support to live in the same standard of living as she had when she was married.
>
> The Court is going to find that she's been fully rehabilitated and gained full and complete financial independence from Respondent, Mr. Micheli.
>
> Therefore, maintenance is going to be terminated *instanter*."

¶ 16    Ellen appealed again, arguing that (1) "The circuit court improperly limited the scope of review after erroneously concluding that maintenance was originally intended to be rehabilitative for a fixed term"; (2) The circuit court erroneously concluded that Ellen was fully rehabilitated and not financially independent"; and (3) Proper application of the statutory factors and/or guidelines, objectively warranted maintenance on review."

¶ 17    As to Ellen's third argument, this court held that she was not entitled to relief pursuant to the maintenance guidelines in section 504(b-1)(1) of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) because those guidelines do not apply to the review of a pre-guideline maintenance award. *In re Marriage of Micheli*, 2022 IL App (2d) 200704-U, ¶ 57 ("*Micheli IV*").

¶ 18    This court held that the trial court erred in finding that the parties' dissolution judgment awarded rehabilitative maintenance subject to review. To wit:

"[T]he dissolution judgment contains no limitations on future maintenance review, aside from providing a deadline by which Ellen was required to seek review, and there is no prior agreement by the parties delineating the scope of review. Although the judgment referenced Ellen's rehabilitative potential, it did not explicitly condition maintenance review on Ellen's efforts toward rehabilitation. [Citations]. Thus, the instant trial court erred in characterizing the maintenance award as rehabilitative and interpreting it as requiring Ellen to demonstrate satisfactory efforts toward self-sufficiency as a prerequisite to receiving an extension of maintenance. [Citation]." *Micheli IV*, 2022 IL App (2d) 200704-U, ¶ 42.

¶ 19    This court went on to find that "[t]he trial court's incorrect characterization of the initial maintenance award is all the more problematic in that the court did not discuss John's circumstances as they relate to the statutory factors." *Id*. ¶ 44. We concluded that:

"The trial court explicitly discussed Ellen's circumstances as they related to the statutory factors and the standard of living established during the marriage, but it did not explicitly reference John's circumstances nor any of the remaining statutory factors. Failure to consider one party's income or assets in determining whether an award of maintenance is appropriate is an abuse of discretion. [Citation]. Because the court mischaracterized the initial maintenance award and referenced only Ellen's circumstances, it is unclear whether the trial court considered John's current income, the change in his income since the dissolution judgment, his current assets, his acquisition of assets since the dissolution judgment, or his present and future earning capacity. See 750 ILCS 5/504(a)(1), (3), (9) (West Supp. 2019); *id.* § 510(a-5)(7), (8). Additionally, it is unclear whether the trial court considered the duration of maintenance payments previously paid relative to the length of the marriage. See 750 ILCS 5/510(a-5)(5) (West Supp. 2019). Thus, we remand to the trial court to conduct a general review of the initial maintenance award and to consider the relevant statutory factors that apply to *both* Ellen's and John's circumstances as well as any of the other statutory factors the trial court determines to be relevant. *Id.* ¶ 46 (Emphasis in original).

¶ 20 On remand, Ellen filed a motion to conduct general maintenance in accord with appellate instructions, requesting as follows:

"In accord with the directives of the Appellate Court, Ellen prays for the immediate adjudication of her long-pending Petition for Review and Extension of Maintenance without further delay. In conducting the general review required by the Appellate Court, this Court should take into consideration the evidence already of record from the 2020 trial, and reopen the proofs and discovery only to the extent necessary to ascertain the requisite

facts to allow for a complete general review as instructed in accord with the law of the case from *Micheli IV*."

¶ 21 The trial court ordered the parties to submit written arguments regarding this court's mandate along with proposed orders. On July 21, 2023, the trial court issued a written order. Regarding Ellen's request to reopen the proofs and discovery, the trial court found that

"[T]he Court finds that the mandate and opinion issued by the Second District authorized a general review of Ellen's maintenance award, which would require considering the applicable statutory factors, as well as both former spouses' circumstances as reflected in the evidence presented at trial in 2020. However, that mandate did not authorize reopening the proofs as part of a completely new evidentiary hearing. In any event, holding a new evidentiary hearing on the topic of John's income and assets in 2019 would serve no purpose, because of the cap on John's obligation to pay maintenance that was previously affirmed by the Second District as reflective of Ellen's lifestyle during the marriage, as well as John's trial stipulation concerning his continued ability in 2020 to pay any amount of reviewable maintenance."

¶ 22 The trial court's order went on to address Ellen's 2019 petition for review and extension of maintenance pursuant to the factors articulated in section 504(a) and 510(a-5) of the IMDMA, based on the evidence adduced at the trial in 2020. The trial court found that maintenance should be terminated, concluding that "Ellen's own employment income and assets in 2020 have allowed her to acquire financial independence from her former spouse, and to enjoy a standard of living that is commensurate with her lifestyle during the marriage."

¶ 23 Ellen then timely filed the present appeal.

¶ 24                                          II. ANALYSIS

¶ 25    In this appeal, Ellen contends that the trial court erred in finding that this court's mandate in *Micheli IV* did not authorize reopening the proofs or discovery as part of a new evidentiary hearing and general review of maintenance. Additionally, Ellen contends that the trial court erred in terminating maintenance.

¶ 26    A trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court. *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276 (1982). Where the reviewing court gives specific directions, "a positive duty devolves upon the court to which the cause is remanded to enter an order or decree in accordance with the directions contained in the mandate." *Id.* Following the issuance of such a mandate, the trial court is vested with jurisdiction to take only such action as conforms to that mandate. *Id.* Whether the trial court has done so is a question of law that we review *de novo*. *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 351 (2002).

¶ 27    Nothing within the mandate of *Micheli IV* spoke to the authorization, or lack thereof, of the trial court to reopen the proofs or discovery before conducting a general review of maintenance. Our mandate authorized a general review of Ellen's 2012 maintenance award through the trial court's consideration of the applicable statutory factors enumerated in sections 504(a) and 510(a-5) of the IMDMA, based on both parties' circumstances as presented through the evidence introduced at the 2020 hearing. See *Micheli IV*, ¶ 46. Indeed, the trial court adhered to the directions in that mandate and, as a matter of law, committed no error.

¶ 28    Ellen maintains that trial court had the authority, regardless of the mandate's language, to reopen the proofs or discovery. She argues that the trial court's denial of her request was based on an incorrect determination that because her trial counsel "did not ask to reopen discovery or to delay/schedule discovery," Ellen had "forfeited her discovery-related arguments on remand" based on the "law-of-the-case doctrine."

¶ 29    The trial court has broad discretion in ruling on discovery matters, and the exercise of this broad discretion will not be overturned on appeal unless there was a clear abuse of that discretion. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 16. A court abuses its discretion where no reasonable person would agree with the court's position. *Petraski v. Thedos*, 382 Ill. App. 3d 22, 26 (2008).

¶ 30    Prior to the 2020 hearing, Ellen filed a motion *in limine* that sought to bar John from raising any defenses to her petition for review and extension of maintenance. Her request was based on John's alleged failure to comply with local court rules and the trial court's November 22, 2019, order requiring his production of updated financial disclosures before the hearing. She argued that she had no way of impeaching John's testimony without updated financial disclosures. However, she admitted that she had not made further discovery requests or taken John's deposition prior to the 2020 hearing date. After the trial court denied Ellen's motion *in limine*, she took no further action insofar as requests to reopen discovery or reschedule the hearing. The trial court's ruling on Ellen's motion *in limine* was not raised to this court in *Micheli IV*.

¶ 31    The law-of-the-case doctrine limits relitigation of a previously decided issue in the same case and encompasses not only the reviewing court's explicit decisions, but those issues decided by necessary implication. *Rommel v. Illinois State Toll Highway Authority*, 2013 IL App (2d) 120273, ¶ 15. The doctrine applies to questions of law on remand to the trial court, as well as on subsequent appeals to the appellate court. *Id*. The law-of-the-case doctrine may not preclude reconsideration of an earlier order if the facts before the trial court changed or error or injustice was manifest. *Aardvark Art, Inc. v. Lehigh/Steck-Warlick, Inc.*, 284 Ill. App. 3d 627, 633 (1996).

¶ 32    Applying the law-of-the-case doctrine to the present matter, we can find no abuse of discretion with the trial court's determination that Ellen had "forfeited her discovery-related arguments on remand." As a general rule, the failure of a party to challenge a legal decision when

it has the opportunity to do so renders that decision the law-of-the-case for future stages of the same litigation, and that party is deemed to have waived the right to challenge that decision at a later time. *Liccardi v. Stolt Terminals, Inc.*, 178 Ill. 2d 540, 547 (1997). Ellen's failure to raise discovery issues to this court in *Micheli IV* renders them decided by implication as the mandate ordered the trial court to conduct a "general review of the initial maintenance award and to consider the relevant statutory factors that apply to both Ellen and John's circumstances" with the evidence introduced at the 2020 hearing. *Micheli IV*, ¶ 46.

¶ 33 As a final note on this contention, the facts before the trial court had not changed upon remand. Requiring the trial court to hold a new evidentiary hearing as to John's 2019 financial disclosures would constitute an exercise in futility due this court's holding in *Micheli III* that capped John's maintenance obligation at $320,000, an amount that reflected Ellen's lifestyle during the marriage. *Micheli III*., ¶ 34. Further, John stipulated that he was capable of paying any amount of maintenance awarded. We find no error in the trial court's findings to that effect.

¶ 34 We next examine Ellen's contention that the trial court erred in terminating maintenance. She argues that the trial court's findings are not supported by the evidence because her income was insufficient to maintain the standard of living she enjoyed during the marriage. Ellen maintains that a review of the relevant statutory factors supports an extension of maintenance.

¶ 35 A trial court's decision to modify maintenance upon conducting a review of maintenance will not be disturbed absent a clear abuse of discretion. *Blum v. Koster*, 235 Ill. 2d 21, 26 (2009). A clear abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id*. When a party challenges a trial court's factual findings regarding maintenance, we will not reverse those findings

unless they were against the manifest weight of the evidence. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 30.

¶ 36     Ellen argues that several of the trial court's factual findings were against the manifest weight of the evidence. Namely, the finding that (1) Ellen's "earned income from her job at CDW and passive income from her non-retirement assets in 2020 was sufficient for her to maintain the standard of living she enjoyed during the marriage"; (2) Ellen's "total earnings at the time of trial (exclusive of maintenance) appear to be at least equivalent to the total amount that she was due to receive in 2012 from her own income and the Court's initial maintenance award"; (3) Ellen's net worth in 2020, factoring in "her residence, bank accounts, investment accounts, retirement accounts, and automobiles: was "at least equivalent to the overall net worth of the marital estate prior to the entry of the dissolution judgment in 2012"; and (4) Ellen's health conditions did not put her full-time employment in jeopardy after she returned from her leave of absence. We will address the propriety of each factual finding in turn.

¶ 37     The evidence at the 2020 trial showed that Ellen's total income in 2017 was $146,673; $77,903 came from her CDW salary, $53,548 from maintenance payments, and $2,463 from dividend income. Her total income in 2018 was $131,297; $74,626 from her CDW salary, $53,548 from maintenance payments, and $2,963 from dividend income. In 2019, she earned $73,438 from her CDW salary and $53,548 from maintenance payments. No evidence of passive income from dividends in 2019 was introduced.

¶ 38     Ellen's January 2020 financial affidavit shows a gross monthly income of $11,312. This amount included $5,833 from her CDW salary, a $291 holiday bonus from the prior year, $811 in interest income from a Fidelity account, $677 in dividend income, and $3,700 from maintenance payment. Her total monthly deductions total $2,560 for taxes and health insurance. Her monthly

household expenses total $5,999. Transportation and personal expenses totaled $3,857. Her financial affidavit shows that she accumulates a monthly deficit of $1,104.

¶ 39    The trial court's finding that Ellen's income from CDW and passive income from non-retirement assets in 2020 was sufficient to maintain the standard of living she enjoyed during the marriage was against the manifest weight of the evidence. The trial court did not have enough evidence of Ellen's 2020 dividend income to make that finding. Even if Ellen were to receive dividend income comparable to 2017 or 2018, without maintenance payments from John her income would be insufficient to enjoy the standard of living during the marriage when she had access to the $320,000 income cap set by this court.

¶ 40    We now turn to the trial court's finding that Ellen's "total earnings at the time of trial (exclusive of maintenance) appear to be at least equivalent to the total amount that she was due to receive in 2012 from her own income and the Court's initial maintenance award." The record shows that Ellen was earning $45,000 gross annually from employment with Stevenson High School at the time of the parties' dissolution. The dissolution judgment awarded Ellen maintenance of "$3,700 per month **** plus 20% of any gross bonus received by John." Therefore, Ellen was receiving at least $89,400 gross annually in 2012. In 2020, Ellen was earning somewhere between $73,000 and $78,000 gross annually, plus an unknown amount of dividend income. The trial court's finding that Ellen's total earnings in 2020 were "at least equivalent" to her income and maintenance income in 2012 is belied by the record and against the manifest weight of the evidence.

¶ 41    We now turn to the trial court's finding that Ellen's net worth in 2020, factoring in "her residence, bank accounts, investment accounts, retirement accounts, and automobiles: was "at least equivalent to the overall net worth of the marital estate prior to the entry of the dissolution

judgment in 2012." Ellen argues that this finding is against the manifest weight of the evidence because it "was not based on evidence from the original hearing. Instead, it was taken from the baseless claims in John's written closing argument and oral rebuttal submitted after the original hearing that the trial court accepted as factual." However, that assertion is not completely true. Ellen's January 2020 financial affidavit states that she had (1) $77,532 in cash; (2) $532,477 in investment accounts and securities; (3) two vehicles worth $6,500; (4) a CDW 401(k) worth $9,340; (5) a rollover IRA worth $584,805; (6) three separate retirement accounts with a combined monthly benefit of $6,660.23; and (7) approximately $200,000 in residential equity.

¶ 42    It is unclear from the record exactly to what Ellen's 2020 net worth was being compared, as there was no evidence offered to establish the net worth of the marital estate prior to dissolution. John claims that the trial court was presented with a "marital balance sheet" attached to his written closing argument presented post-trial in 2012. That attachment purports to represent the value of the marital estate in 2012 as $1,067,467. But this "marital balance sheet" was not introduced into evidence in either 2012 or 2020. It is error to permit the trier of fact to consider documents that have not been tendered or admitted into evidence. *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 21. A party's net worth is not this court's standard in determining whether maintenance should be continued upon review. Rather the standard of living that the parties' maintained during the marriage is the crux of the issue. Because Ellen's standard of living in 2020, based on John's capped income of $320,000 is what is at issue in her petition to review maintenance, the trial court's comparison of the different eras of net worth is of no event.

¶ 43    The final factual finding that Ellen takes issue with here is the trial court's assertion that her health conditions did not put her full-time employment in jeopardy after she returned from her leave of absence. We detailed much of Ellen's testimony related to benign brain tumors above (see

*supra* ¶ 14) and acknowledge that she was forced to go on leave from her job with CDW, costing her approximately $5,000 in salary during 2020. John argues that Ellen admitted on cross-examination that her doctor had found her able to work without restrictions as of April 17, 2020, and that she was working 55 to 70 hours per week as of August 2020. However, Ellen offered uncontradicted testimony that her symptoms had returned after she went back to work and the extensive hours have affected her ability to manage her health. She testified that since returning to work, her "headaches started coming back" and she "started to feel that old brain fog again." She testified that her blood pressure had started to increase and she felt fatigued since returning to work. She stated she had started to look for other employment but she "can't really afford to lose that income even though John pays me alimony and stuff, but I'm facing the choice between making money and managing my health."

¶ 44 Based on the foregoing, uncontradicted testimony, the trial court's finding that "there appears to be no evidence in the record that Ellen's efforts at managing her health condition during the workday in 2020 was somehow jeopardizing her full-time employment at CDW" was against the manifest weight of the evidence. The trial court asserted that "she had to nap in the middle of the workday" and "made lifestyle changes and started taking blood pressure medication" as the basis for its finding that her future employment is in no jeopardy, despite voluminous testimony to the contrary.

¶ 45 Per this court's mandate in *Micheli IV*, the trial court was required to conduct a general review of the initial maintenance award and to consider both Ellen and John's circumstances under the factors in sections 504(a) and 510(a-5) of the IMDMA. See *Micheli IV*, ¶ 46. Ellen argues that application of the statutory factors set forth in those sections to the evidence adduced at the 2020 hearing established the need for an extension of maintenance.

¶ 46 Section 504(a) of the IMDMA provides:

"In a proceeding for dissolution of marriage, *** the court may grant a temporary or permanent maintenance award for either spouse in amounts and for periods of time as the court deems just, *** in gross or for fixed or indefinite periods of time, and the maintenance may be paid from the income or property of the other spouse after consideration of all relevant factors, including:

(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

Further, "in proceedings in which maintenance is being reviewed, the court shall consider" the factors set forth in section 510(a-5) of the IMDMA:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of

invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." *Id.* § 510(a-5).

¶ 47 The parties were married for 24 years and raised two children. John's maintenance obligation was 7 years. Pursuant to the dissolution judgment, the marital estate was divided equally between the parties, except for their 401(k) and IRA, which were divided 60/40 in favor of Ellen.

¶ 48 The trial court's findings on John's financial situation and standard of living accurately reflect the evidence in the record. John holds an executive position at Allstate Insurance Company, where he has worked for 33 years. In 2019, John earned $640,649.38, received company 401(k) contribution match, dividends, and a $452 car allowance with each paycheck. He owns a home that he purchased in 2013 for $650,000. He has brokerage investments valued at $1,150,000. He has two cars with a collective value of $100,000. His retirement accounts are valued at $900,000 and the expected yield on his pension is approximately $6,942 in monthly income.

¶ 49 Since the entry of the parties' dissolution judgment, Ellen has accumulated little independent wealth. She owns shares of CDW stock worth $16,336 and has a CDW 401(k) valued at $9,339. It is true that her investment and retirement accounts are valued at over $1,000,000, but the testimony showed that she cannot access those funds without penalty until she turns 65 in 2028. Until that time, Ellen should expect to have a monthly deficit of approximately $1,100, even with maintenance payments from John. She testified that she has had to "dip into [her] savings or assets"

because she did not always have sufficient cash on hand to pay the taxes, medical bills, and legal fees. Additionally, to maintain her current living expenses, Ellen would have to liquidate her assets to supplement her employment income unless maintenance payments were extended.

¶ 50    Ellen's health problems cast a cloud on her future earning potential as well. She has taken a leave of absence from her job at CDW, and her testimony indicated that a future medical leave of absence is not out of the realm of possibility. John has stipulated that he can pay any amount of maintenance awarded and made no indication that his ability to work in the future is jeopardized in any way.

¶ 51    Without further maintenance Ellen would be forced to liquidate assets in order to enjoy a standard of living established during the parties' marriage. Where the spouse from whom maintenance is sought has sufficient income to meet his own needs while meeting those of his spouse, the spouse seeking maintenance is not required to sell her assets or impair her capital in order to maintain herself in the manner established during the marriage. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 304 (2010).

¶ 52    We thus conclude that the trial court abused its discretion in terminating Ellen's maintenance. Although we may remand to the trial court for entry of an appropriate award, Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) provides that we may "enter any judgment and make any order that ought to have been given or made." As this constitutes the fifth appeal in this case, we have the luxury of a complete record that fully supports the entry of judgment extending Ellen's maintenance. Remand for further proceedings would be a waste of resources for both the parties and the judiciary.

¶ 53                                III. CONCLUSION

¶ 54    For the reasons stated, judgment of the circuit court of Lake County is affirmed in part and reversed in part. This court hereby enters an order granting Ellen's petition for extension of maintenance. See IL. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994). John's maintenance obligation shall be $4,462 monthly, extended until Ellen is eligible to access retirement benefits on December 21, 2028.[2]

¶ 55    Affirmed in part and reversed in part; order entered.

---

[2] Although Ellen's petition for extension of maintenance requested monthly maintenance of $4,932, in *Micheli III*, this court set John's maximum monthly maintenance obligation at $4,462 per the annual income cap of $320,000. *Micheli III*, ¶ 16.