NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240775-U

NO. 4-24-0775

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 13, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CENTRAL ILLINOIS MORTUARY SERVICES, LTD., | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| TAMMY R. ABTS, | ) | No. 23LA133 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Stewart J. Umholtz, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court modified but otherwise affirmed the judgment in a breach-of-contract case where, apart from a mathematical error, the trial court's decision was supported by the evidence.

¶ 2   Plaintiff, Central Illinois Mortuary Services, Ltd. (CIMS), sued defendant, Tammy R. Abts, for breach of contract. Following a bench trial, the trial court entered judgment in favor of CIMS for $89,150, plus costs of $381. Abts appeals. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we modify the judgment to $77,650, plus costs of $381, but otherwise affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. Introduction

¶ 5   CIMS characterizes this action as a "messy dispute." The record confirms this. The parties did extensive business with each other for years without being on the same page as to either

the cost of services or which payments would apply to which invoices. When the matter proceeded to trial on CIMS's breach-of-contract action, the witnesses failed to present detailed testimony containing the calculations necessary for an accurate determination of liability and damages. Rather than do all the math itself, the trial court relied on CIMS's counsel's representation about the amount of an arrearage reflected by the documentary evidence. The court then committed a mathematical error when calculating damages. Compounding the chaos, a microphone was muted during CIMS's entire case-in-chief, so there is no transcript of half the trial, and the parties rely on a relatively sparse agreed statement of facts.

¶ 6        For the benefit of the reader, we will present a chronological narrative derived from the entire record to contextualize the parties' respective positions regarding liability and damages.

¶ 7                B. The Parties, the 2017 Litigation, the Stock Purchase

Agreement, and the Unsigned Services Agreement

¶ 8        The Abts family and the Koonce family both work in the funeral industry. At one point, members of the families co-owned the shares of a company called Cremation Society of Mid-Illinois Co. (Cremation Society). From at least January 2013 until October 2017, Cremation Society orally contracted with CIMS, a company owned by the Koonce family, to provide body removal and cremation services. At some point, Cremation Society fell behind on its payments to CIMS, leading to litigation in Peoria County in 2017.

¶ 9        This litigation settled and prompted a stock purchase agreement executed on October 2, 2017. Pursuant to the stock purchase agreement, Abts became the sole shareholder of Cremation Society, even though it was by this point involuntarily dissolved. The stock purchase agreement indicated that Abts would be responsible for reinstating Cremation Society's corporate charter. The stock purchase agreement also contemplated the execution of a services agreement.

¶ 10    An unsigned copy of a document entitled "Services Agreement" is in the common law record but was not admitted as an exhibit at trial. From comments made by Abts's counsel at trial, it seems that the trial court declined to admit this document into evidence upon determining that it was not a valid contract. According to the unsigned services agreement, Cremation Society would generally purchase all removal and cremation services from CIMS at specified rates that evidently were discounted from CIMS's normal rates. The second page of this unsigned document, which Abts claimed she did not receive until years later, provided that the term of this agreement was October 1, 2017, through September 30, 2019.

¶ 11    C. Cremation Society Catches up on Its Debt Upon

Settling the 2017 Litigation

¶ 12    Each of CIMS's invoices that were admitted at trial detailed a month's services, without reflecting any arrearage carried over from prior months. Thus, the only way to ascertain how much was owed on the account at any given time is to compare the separate list of amounts invoiced against the other list of payments received.

¶ 13    The record shows that Cremation Society caught up on its debt to CIMS around the time of the settlement of the 2017 litigation. Specifically, on September 6, 2017, Cremation Society paid CIMS $58,075, which was far more than the amount invoiced in any month. According to our review of the trial exhibits, a comparison of amounts invoiced versus payments received shows that as of October 1, 2017—the day before Abts executed the stock purchase agreement—Cremation Society owed $3,990 on its account ($397,580 invoiced minus $393,590 paid). This balance was due to an invoice for $5,090 that was issued on September 30, 2017. On October 10, 2017, CIMS received a timely payment of $5,090, thus seemingly eliminating all debt accrued before Abts became the sole shareholder of Cremation Society.

¶ 14        D. The Parties' Interactions After Settling the 2017 Litigation

¶ 15        After settling the 2017 litigation, Abts never reinstated Cremation Society as a legal entity. However, Abts continued doing business as Cremation Society while requesting CIMS's services in her individual capacity. CIMS invoiced Cremation Society for those services because CIMS never changed the name in its billing software. Abts continuously remitted payments for the next five years or so, though not always in full satisfaction of the amounts owed.

¶ 16        It is undisputed that CIMS invoiced Cremation Society at a discounted rate for some time after the parties executed the stock purchase agreement, evidently until January 2019. However, the parties disagreed as to the source and nature of the discount. Abts believed she was perpetually entitled to the discounted rates outlined in the unsigned services agreement. By contrast, William Koonce, who was responsible for CIMS's operations, believed that CIMS did not have a written agreement with Cremation Society. Koonce confirmed that, at some point he did not remember, he unilaterally stopped applying a discount to invoices when Abts started getting behind on payments. Nevertheless, each monthly invoice itemized charges for specified services, and Abts continued paying without protesting the rate increases.

¶ 17        The parties never discussed how Abts's payments would be applied. Although Abts did not know it, CIMS's accounting software automatically applied payments to the oldest debt first. Thus, the arrearage on this account increased over time. According to our review of the trial exhibits, a comparison of the amounts invoiced versus payments received shows that from October 2, 2017, through October 31, 2021, Abts accrued an arrearage of $76,410 ($497,875 invoiced minus $421,465 paid).

¶ 18        Between November 1, 2021, and August 31, 2022, CIMS issued 10 more invoices totaling $137,440, and Abts made payments totaling $92,750. The parties then ceased doing

business with each other.

¶ 19                          E. Commencement of the Present Lawsuit

¶ 20          On May 31, 2023, CIMS sued Abts for breach of contract. CIMS alleged that Abts owed $125,090 on the 10 invoices it issued between November 1, 2021, and August 31, 2022. This amount coincided with what CIMS had billed Cremation Society since 2013 ($1,032,895) minus all payments received ($907,805).

¶ 21                                      F. Bench Trial

¶ 22          The matter proceeded to a bench trial on March 8, 2024. The testimony presented, though relatively sparse, was consistent with the facts outlined above. Additionally, Abts submitted her calculations that she should have been charged $83,400, not $137,440, for the 10 invoices issued between November 1, 2021, and August 31, 2022.

¶ 23          In closing argument, CIMS's counsel asserted that Abts "got current" on the account after the 2017 lawsuit but then "perpetually got behind again." According to CIMS's counsel, CIMS properly applied payments to the oldest invoices first, resulting in Abts owing $125,090 for the 10 invoices issued between November 1, 2021, and August 31, 2022. CIMS's counsel proposed that there were "no documents in evidence regarding the amounts of the discounts that [Abts] thought she was entitled to" and that Koonce temporarily gave Abts a discount just because "[h]e was getting all of her business."

¶ 24          In his closing argument, Abts's counsel emphasized that CIMS sued Abts based on the 10 invoices issued between November 1, 2021, and August 31, 2022, not for any amount she owed previously. Abts's counsel contended that Abts overpaid on those 10 invoices, as she should have been charged only about $83,000 and made payments totaling $92,750. Abts's counsel also mentioned that (1) Koonce's testimony lacked detail about the arrearage, (2) CIMS never sent Abts

a delinquency notice or told her how it was processing her payments, and (3) CIMS failed to introduce evidence about how its accounting software worked.

¶ 25        The trial court made factual findings that this account was in arrears and that it was an acceptable accounting practice for CIMS to apply payments to the oldest debt first. The court determined that "the discount would apply," though the court lamented the lack of documentation regarding the nature or circumstances of that discount. The court commented that it was not clear what the arrearage was on the account when Abts made the payments totaling $92,750 between November 1, 2021, and August 31, 2022. Abts's counsel interjected that the documents in the record purportedly showing an arrearage went back to 2013, before Abts "got the business." The court responded that Abts "purchased this business" and failed to reinstate the corporation, so "[i]t's not an excuse to say you didn't know."

¶ 26        The trial court then asked the attorneys whether there was "anything in evidence to indicate when this [$]92,000 [*sic*] was applied what the arrears was at that point in time." CIMS's counsel represented to the court that documents in the record showed the arrearage was "over $87,000" in November 2021.

¶ 27        The trial court accepted CIMS's counsel's representation about the amount of the arrearage. The court reasoned that Abts's payments of $92,750 between November 1, 2021, and August 31, 2022, would be applied to that arrearage first. The court then said: "So the court is going to find after payment of [$92,750] that would leave an arrears [*sic*] of [$]5750." (This was a mathematical error on the court's part, as payments of $92,750 against a $87,000 debt would leave a surplus of $5,750, not an arrearage.)

¶ 28        Returning to the issue of the discount, the trial court found that because it had "no credible testimony as to when this discount would have ended," it would apply the discount to the

10 invoices at issue in CIMS's complaint. Accepting Abts's calculations about how this discount would apply to those 10 invoices, the court found that "the total with discount is [$]83,400." The court said that, based on its calculations, this would "leave the amount of $89,150," which would "be the amount of the judgment." (Again, the court's math was faulty. If Abts owed $87,000 in November 2021 and she was thereafter charged $83,400 and made payments of $92,750, she would owe $77,650, not $89,150.)

¶ 29        After the trial court issued its ruling, Abts's counsel argued that "this arrearage they started from 2013, that was against the corporation that went out of business." The court responded: "On that I've already made the finding. She purchased it. She's accepted responsibility." Abts's counsel replied: "No. She didn't purchase the corporation because it didn't exist. You can't purchase something that doesn't exist." The court said that it ruled that Abts purchased the business.

¶ 30        Abts's counsel then brought up that "the invoices that the arrearages were supposedly based on" did not have a discount applied to them. The trial court responded:

> "Because of the lack of certainty on evidence that was presented to the Court—I can't correct everything that's in these many records here, but I think that this is a fair and reasonable resolution of that interest issue by applying it on the remaining invoices that are the subject of this complaint."

The court entered judgment in CIMS's favor in the amount of $89,150, plus costs of $381.

¶ 31        G. The Motion to Reconsider, Notice of Appeal, and Motion

Taken With the Case

¶ 32        Abts filed a motion to reconsider the judgment or, in the alternative, for a new trial. She reiterated many of the points raised at trial. However, she raised a few new arguments.

Specifically, Abts contended that although she believed there was no arrearage "when she purchased the business" on October 2, 2017, the trial court erred by holding her responsible for preexisting corporate debts. Abts also contended that, starting with an invoice issued on January 31, 2019, CIMS did not apply a discount for services. Abts attached to her motion a list she created reflecting the amounts she was invoiced each month from October 2017 through August 2022 versus the amounts she believed each invoice should have been if a discount were applied. On that list, Abts outlined that (1) she was invoiced $635,315 during this period, (2) she should have been invoiced only $512,900, and (3) she made payments totaling $509,125. Based on these figures, Abts proposed that she owed CIMS only $3,775.

¶ 33 The trial court denied Abts's motion, and she timely appealed. In this court, Abts filed a motion to take judicial notice of the complaint filed in conjunction with the 2017 litigation. CIMS objected to Abts's motion. We ordered that the motion be taken with the case.

¶ 34 II. ANALYSIS

¶ 35 On appeal, Abts argues that the judgment was erroneous because (1) she is not personally liable for the debt of a dissolved corporation, (2) CIMS already sued Cremation Society for the same alleged debt, (3) CIMS did not allege in its complaint that Abts was responsible for Cremation Society's past debt or that any arrearage existed, and (4) the trial court miscalculated the judgment by making a mathematical error and failing to give Abts the benefit of a discounted rate for all invoices issued after October 2, 2017.

¶ 36 CIMS responds that Abts's arguments about assumption of corporate debt are "red herrings" because Abts incurred the debt at issue "well after 2016." With respect to the calculation of damages, CIMS argues that the trial court came to a reasonable and equitable resolution, without giving either party what it wanted.

¶ 37            "To succeed on a breach of contract claim, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28. We may not overturn a decision awarding damages for breach of contract unless the judgment is against the manifest weight of the evidence, meaning that the opposite result is clearly evident. *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 84. In conducting our review, we keep in mind that in a bench trial, the trial court is tasked with assessing witness credibility, weighing the evidence, drawing reasonable inferences, and resolving conflicts in the record. *Young*, 2022 IL App (4th) 220302, ¶ 84.

¶ 38            Abts challenges whether CIMS proved damages based on nonpayment of invoices. Abts first maintains that it was inappropriate, for multiple reasons, to hold her responsible for Cremation Society's debts predating the October 2, 2017, stock purchase agreement. These arguments are unpersuasive. A comparison of amounts invoiced versus payments received shows that the corporate debt was satisfied in 2017 and has nothing to do with the debt Abts subsequently incurred when she did business with CIMS. Abts proposes that some of the trial court's remarks could be interpreted as the court finding she was responsible for preexisting corporate debts. However, we review the court's judgment following a bench trial, not its reasoning. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25.

¶ 39            As part of the support for her argument that it was inappropriate to hold her responsible for corporate debts, Abts filed a motion to take judicial notice of the complaint filed in conjunction with the 2017 litigation. Having considered this motion and CIMS's objection, we hereby deny the motion. It is improper for Abts to challenge the judgment by attempting to introduce new evidence on appeal. See *Alms v. Peoria County Election Comm'n*, 2022 IL App

(4th) 220976, ¶ 32 (noting that "judicial notice cannot be used to introduce new evidentiary material that was not considered by the fact finder"); *Kennedy v. Edgar*, 199 Ill. App. 3d 138, 143 (1990) ("[A] reviewing court will not take judicial notice of critical evidentiary material not presented in the court below, especially where the evidence may be significant in the proper determination of issues between the parties.").

¶ 40        Even if we were to consider it, we note that the 2017 complaint does not support Abts's claim that she was held responsible for corporate debts. The 2017 complaint sought $54,850 relating to invoices that CIMS issued between September 2016 and May 2017. Exhibits in evidence in connection with the present case confirm that Cremation Society paid those invoices in full by September 6, 2017. Thus, aside from the impropriety of Abts asking us to take judicial notice of new evidence on appeal, the proposed new evidence does not even support Abts's arguments.

¶ 41        Throughout this litigation, Abts has maintained that it was inappropriate for CIMS to apply payments to the oldest invoices first. However, CIMS was entitled to do so. "Where a debtor makes a payment to a creditor to whom he or she is indebted on several accounts, the debtor has the right to indicate the item to which the payment shall apply." *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 29. "If the debtor does not so indicate, the creditor ordinarily can select to which item it will apply the payment." *Jill Knowles Enterprises*, 2017 IL App (2d) 160811, ¶ 29. Abts never conveyed an instruction or expressed a preference to apply payments to specific invoices, so CIMS was justified in allocating payments as it deemed fit. Given the parties' long-standing history of contracting for similar services each month, the trial court reasonably found that CIMS appropriately applied payments to the oldest invoices. See *Griffin Wellpoint Corp. v. Engelhardt, Inc.*, 92 Ill. App. 3d 252, 262 (1980) (approving of a creditor's

decision to apply payments to the oldest debt first where the debtor did not specify otherwise).

¶ 42    Abts also contends that the trial court lacked authority to enter the judgment because CIMS failed to allege an arrearage in its complaint. This argument fails. CIMS alleged that Abts owed $125,090 on invoices issued between November 1, 2021, and August 31, 2022, which coincided with the amount CIMS had billed Cremation Society since 2013 minus all payments received. Thus, the complaint properly alleged the account was in arrears. Abts cites *Zygmuntowicz v. Pepper Construction Co.*, 306 Ill. App. 3d 182, 184 (1999), a case in which the appellate court held that in the absence of a third-party claim for contribution, a trial court lacked jurisdiction to apportion liability between a settling defendant and another entity. Here, by contrast, there was a pleading on file requesting a money judgment against Abts, which is the same relief the trial court ordered. Abts's suggestion that the court lacked authority or jurisdiction to enter the judgment is incorrect.

¶ 43    Abts further argues that the trial court committed a mathematical error in calculating the judgment. CIMS does not respond to this point. As set forth in the statement of facts, the court erred when it determined that $87,000 (the claimed arrearage as of November 1, 2021) plus $83,400 (the new amounts invoiced between November 1, 2021, and August 31, 2022, inclusive of a discount) minus $92,750 (payments made between November 1, 2021, and August 31, 2022) equals $89,150. The correct judgment amount based on these figures should have been $77,650. We note that Abts does not argue that CIMS's counsel was inaccurate in calculating the arrearage on the account as $87,000. Accordingly, Abts has forfeited any challenge she could have raised with respect to that specific issue. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (establishing that points not argued are deemed forfeited).

¶ 44    Abts's last contention is that she was entitled to a discounted rate for all services

that CIMS performed after October 2, 2017, not just the services encompassed by the 10 invoices issued between November 1, 2021, and August 31, 2022. Abts did not raise this issue until after the trial court announced its judgment and did not submit her calculations until she filed her motion to reconsider. Under those circumstances, Abts did not present her claim in a timely fashion. More fundamentally, however, the record and case law do not support Abts's position about how the discount should apply, so the judgment was not against the manifest weight of the evidence in this respect.

¶ 45    In presenting her argument on this issue, Abts seems to assume that the trial court found she was entitled to a perpetual discount for all invoices issued after October 2, 2017. The record instead suggests that the court believed some type of discount applied to the parties' transactions but that the parties did not present adequate evidence about the nature or scope of that discount. As we read the record, the court recognized the lack of clarity about the discount and attempted to rule equitably by discounting the 10 invoices cited in the complaint using the calculations that Abts presented at trial. Contrary to what Abts assumes, the court never made an express finding that Abts was entitled to a discount for all invoices issued after October 2, 2017.

¶ 46    Moreover, Abts cites the unsigned services agreement as the source of her right to a discount. Although we do not have the full transcript of the trial, it seems that the trial court ruled that the unsigned services agreement was not a valid contract, and Abts does not challenge that finding. Furthermore, the second page of the unsigned services agreement, which Abts submitted as an exhibit to her motion to reconsider, specified that the discount expired after September 30, 2019. In calculating that she owes CIMS only $3,775, Abts presumes that she was entitled to the discount after September 30, 2019, even though the document she claims gave her a right to the discount undermines her presumption. Abts does not attempt to address this discrepancy in her

- 12 -

argument.

¶ 47      Additionally, the record shows that Abts repeatedly remitted payments without protesting the lack of a discount. In her motion to reconsider, Abts effectively sought to recover what she considered to be excess payments predating November 1, 2021, and have those amounts applied to different invoices to reduce her arrearage. However, Abts cites no authority supporting her right to do this. "The common-law voluntary payment doctrine embodies the ancient and 'universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal.' " *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 22 (quoting *Illinois Glass Co. v. Chicago Telephone Co.*, 234 Ill 535, 541 (1908)). There is no indication in the record that Abts made payments based on compulsion, duress, fraud, misrepresentations, or a mistake as to material facts. See *McIntosh*, 2019 IL 123626, ¶ 24 (identifying examples of situations where a payment may be involuntary). Notably, CIMS itemized all charges on its invoices, so Abts may not claim that she mistakenly paid too much for services. See *McIntosh*, 2019 IL 123626, ¶ 36 ("Where the nature and amount of a charge is fully disclosed, the plaintiff cannot successfully assert that he or she was operating under a mistake of fact with regard to the charge."). Abts may not challenge the propriety of invoices that she paid years ago, so the trial court correctly rejected Abts's attempts to apply the discount to invoices issued before November 1, 2021. See *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 25 (noting that we review the court's judgment, not its reasoning).

¶ 48      We return to where we started. The trial court was confronted with a messy dispute. Based on the arguments that have been presented on appeal, we cannot say that the judgment was against the manifest weight of the evidence, apart from the mathematical error that we have the

power to correct. See Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (authorizing the appellate court to "enter any judgment and make any order that ought to have been given or made," including a remittitur); *Abbott v. Fluid Power Pump Co.*, 112 Ill. App. 2d 303, 313-14 (1969) (explaining that Rule 366 authorizes a reviewing court to correct a miscalculation of damages). Accordingly, we modify the judgment to $77,650, plus costs of $381, but otherwise affirm.

¶ 49                                    III. CONCLUSION

¶ 50        For the reasons stated, we affirm the trial court's judgment as modified.

¶ 51        Affirmed as modified.